# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EYESMATCH LTD. AND MEMOMI LABS INC., <br><br> Plaintiff, <br><br> v. <br><br> FACEBOOK, INC., INSTAGRAM, LLC, AND WHATSAPP INC. <br><br> Defendant. | C.A. No. 21-111-RGA-JLH |

## DECLARATION OF DR. DAVID FORSYTH IN SUPPORT OF PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| I. | INTRODUCTION ................................................................................................... | 1 |
| | A.   Education and Professional Experience ................................................... | 1 |
| | B.   Compensation ........................................................................................... | 1 |
| | C.   Materials Reviewed and Relied Upon ..................................................... | 1 |
| | D.   Legal Principles ....................................................................................... | 2 |
| | E.   Level of Ordinary Skill in the Art ........................................................... | 4 |
| II. | OVERVIEW OF PATENTS-IN-SUIT .................................................................. | 4 |
| III. | CLAIM CONSTRUCTION .................................................................................... | 5 |
| | A.   Whether the preambles of the independent claims are limiting (481 Patent, 883 Patent) ........................................................................................... | 5 |
| | B.   Disputed Term: "mirror mode" (481 Patent, 883 Patent) ....................... | 9 |
| | C.   Disputed Terms: order of method steps and "the non-ordered steps" (109 Patent) ........................................................................................... | 11 |

I, Dr. David Forsyth, hereby declare as follows:

## I.  INTRODUCTION

1. Counsel for Eyesmatch Ltd. and Memomi Labs Inc. (collectively "Plaintiffs") have retained me as an expert in this matter to offer opinions regarding certain claim construction issues for U.S. Patent Nos. 7,948,481, 8,624,883, 8,982,109, and 8,982,110 (the "Asserted Patents").

2. I submit this declaration based on my personal knowledge and in support of Plaintiffs' proposed claim constructions. If called upon as a witness, I could competently testify to the truth of each statement herein.

3. This declaration contains statements of my opinion formed to date and the bases and reasons for those opinions. I may offer additional opinions based on further review of materials in this case, to rebut opinions offered by any of Defendants' experts, and to address issues raised by Defendants in claim construction briefing to the extent permitted by the Court.

### A.  Education and Professional Experience

4. My qualifications and credentials are fully set forth in my *curriculum vitae*, attached as Attachment 1.

### B.  Compensation

5. I am being compensated for my time in connection with this case at my standard legal consulting rate, which is $450 per hour. I have no personal or financial interest in the outcome of this proceeding.

### C.  Materials Reviewed and Relied Upon

6. In formulating my opinions, I have considered U.S. Patent Nos. 7,948,481, 8,624,883, 8,982,109, and 8,982,110, their corresponding file histories, all documents cited in this declaration, dictionaries both technical and non-technical, the Joint Claim Construction Chart and the documents attached thereto. If the parties alter any of the proposed constructions after this

declaration is submitted, or Defendants' expert submits a declaration offering any claim construction opinion, I may submit a supplemental declaration addressing any new constructions, and/or responding to those opinions, as appropriate and if permitted.

### D. Legal Principles

7. I am not a lawyer. I have been provided with an understanding of the legal principles that govern claim construction and patent validity. I have conducted my analysis in conformance with these principles. I set forth those understandings below.

8. I understand that claim construction begins with the language of the claim and asks how a person of ordinary skill in the art, reading in light of the specification, would have understood the claims terms at the time of invention.

9. I understand that various sources are available that may help show what a claim term should mean. These sources include the text of the claims themselves, the patent's specification, the prosecution history of the patent, and the prior art cited in a patent or in the prosecution history. Together, I understand that these sources are called "intrinsic" evidence. I also understand that other sources for example concerning relevant scientific principles, dictionaries or technical dictionaries, and other information concerning the state of the art is called "extrinsic" evidence. I understand that extrinsic evidence may not be used to contradict the claim language.

10. I understand that claim terms should generally be given their ordinary meaning, which is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention

11. I understand that the context in which a claim term is used can be highly instructive. Other claims of the patent in question, both asserted and not asserted, can also be valuable sources as to the meaning of a claim term. Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in

other claims. Differences among claims can also be a useful guide in understanding the meaning of particular claim terms.

12. I understand that a person of ordinary skill in the art is deemed to read a claim term not only in the context of the particular claim in which the disputed term appears, but also in the context of the entire patent, including the specification. The specification is the primary basis for construing the claims and is considered the single best guide to the meaning of a disputed term. For this reason, the words of the claim must be interpreted in view of the specification. The interpretation of a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to cover within the claim.

13. A claim term should not be interpreted to exclude embodiments disclosed in the specification absent probative evidence on the contrary. I further understand that, in general, the claimed invention is not limited to a preferred embodiment, even if the specification does not describe any other embodiment.

14. In addition to consulting the specification, one should also consider the patent's prosecution history, if it is available. The prosecution history consists of the complete record of the proceedings before the Patent Office and includes cited prior art. The prosecution history can inform the meaning of the claim language by demonstrating how the inventor understood the invention. I understand that the prior art cited in a patent or the prosecution history of the patent also constitutes intrinsic evidence.

15. I have been asked to offer my opinion regarding the level of ordinary skill in the art at the time of the invention or the effective filing date, which I understand to be November 2004 for the 481 and 883 Patents, and December 2012 for the 109 and 110 Patents. I have considered the types of problems encountered in the art, the prior solutions to those problems found in prior

art references, the rapidity with which innovations are made, the sophistication of the technology, the level of education of active workers in the field and my own experience working with those of skill in the art at the time of inventions.

16. I understand that in general, a term or phrase found in the introductory words of the claim, the preamble of the claim, should be construed as a limitation if it recites essential structure or steps, or is necessary to give life, meaning, and vitality to the claim. Conversely, a preamble term or phrase is not limiting where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention. In making this distinction, one should review the entire patent to gain an understanding of what the inventors claimed they actually invented and intended to encompass by the claims.

17. I understand that claim terms are indefinite only if, when read in light of the patent and the prosecution history, they fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

### E. Level of Ordinary Skill in the Art

18. Based upon my experience in this area, a person of ordinary skill in the art ("POSITA") in this field at the relevant time frame would have been familiar with the design of, theory behind, principles of operation of, intended use of, and the underlying technology used in computer vision. This typically would consist of a minimum of a bachelor in science in Computer Science or Electrical Engineering (or related engineering field) plus either a year of graduate training or 2-4 years of relevant experience, with the graduate training or relevant experience including experience in computer vision techniques and principles.

## II. OVERVIEW OF PATENTS-IN-SUIT

19. U.S. Patent No. 7,948,481 (the "481 Patent") and U.S. Patent No. 8,624,883 (the "883 Patent") are directed to systems and methods for enabling appearance comparison with an

interactive display station that is capable of operating in both a mirror mode and a display mode (or both modes simultaneously) on the basis of a user selection. The 481 and 883 Patents claim an "interactive imaging and display station" comprising both an "image-capturing device" (e.g., a camera) and a "mirror-display device," such as a computer or mobile device, that is capable of "switching between at least a mirror mode of operation and a display mode of operation." *See e.g.*, 481 Patent at 3:44-51, Claims 1, 16. In the "mirror mode," a subject is presented with a real-time mirrored view of themselves, while in the display mode of operation, prior mirror views may be recalled from storage and displayed to enable appearance comparison. This allows a user to compare appearance "simultaneously or sequentially" rather than having to, e.g., rely on the user's own recollection, or solely by displaying images that are not live, and not mirrored. *See e.g.*, 481 Patent 4:28-34, Claim 16.

20. U.S. Patent No. 8,982,109 (the "109 Patent") is directed to methods of using software transformations to modify a stream of images of a user captured by a camera, such that the images appear on a display to be the reflection of a conventional mirror, including by reversing, resizing, and applying additional transformation mappings to the image. *See, e.g.*, 109 Patent at Claim 1.

21. U.S. Patent No. 8,982,110 (the "110 Patent") is directed to methods of modifying a stream of images of a user with adaptive transformation mapping so that the images appear to be captured from a different point of view than that of the camera's actual point of view, including by, for example, rotating, resizing, or varying image magnitude. *See, e.g.*, 110 Patent at Claim 1.

### III. CLAIM CONSTRUCTION

    **A.** **Whether the preambles of the independent claims are limiting (481 Patent, 883 Patent)**

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| The preambles are limiting. | The preambles are not limiting. |

22. I understand that Plaintiffs and Defendants disagree regarding whether one of ordinary skill in the art would understand the preambles of the independent claims of the 481 and 883 Patents to be limitations. I have considered both proposals, and it is my opinion that a person of ordinary skill in the art, reading the claims, specifications, and file histories of the Asserted Patents, would understand the preambles of these claims, all of which state that they "enable appearance comparison," to be a limitation.

23. One of ordinary skill in the art would understand from these materials that "appearance comparison" in the preambles of the 481 and 883 Patents is more than a statement of intended use for the claimed inventions. Rather, they would understand that the inventive subject matter in these claims is enabling "appearance comparison" by using a computer device that provides a selectable "mirror mode" that presents a current mirror image of a user's appearance, that can be switched to (or displayed alongside) a "display mode" that presents a previously saved image of the user. *See* 481 Patent at Abstract, 1:24-48; 1:53-64. As such, they would regard "appearance comparison" as reciting essential structure in the claims.

24. First, the specification identifies the problem solved by the invention as appearance comparison. It states that, when engaging in appearance comparison, such as at a retail store, a "customer may try on various articles (e.g., apparel, cosmetics) and/or pose with other articles (e.g., furniture), and may view for each trial a *user-appearance in front of a mirror*, which may be located, for example, at a trial area of the retail store. For example, the customer may try on a first article, e.g., a suit, and view for that first trial his/her *user-appearance in front of the mirror*." 481 Patent at 1:30-35. The customer may then "try on a second article, e.g., another suit." 481

Patent at 1:36-37. In order to engage in appearance comparison, prior to the inventions disclosed in the 481 and 883 Patents, the specification states that the "customer may then need to memorize his/her *user-appearance* from the first trial in order to perform a mental *comparison* between the first article and the second article, thereby to evaluate which of the two articles might be a better fit for the customer." 481 Patent at 1:36-41. However, "the customer may not be able to recall his/her *appearance* for each trial and may therefore be required to repeatedly retry articles, e.g., items of apparels, previously tried on. This may result in a frustrating and inefficient shopping experience." 481 Patent at 1:42-48.

25. Next, the specification discloses that the inventive solution to this problem is to provide a computer device (a "mirror-display device") that enables a selectable "mirror mode" that presents a current mirror image of a user's appearance, and can be switched to (or displayed alongside) a "display mode" that presents a previously saved image of the user, thereby enabling a user to compare their current appearance to their previous appearance. For example, it describes one embodiment as follows:

> As shown in FIG. 3A, the user of system **100** may view a first trial of a ***user-appearance*** in mirror-display device **140** operating in its ***mirror mode***. Controller **121** may receive, e.g., from input device **124**, a user input, which may include a request to use imaging device **130** for capturing a first trial of the ***user-appearance***. As a result, imaging device **130** may capture an image of the first trial of the ***user-appearance*** and storage device **123** may store the captured image.
>
> As shown in FIG. 3B, user **111** may view a ***second trial of his user-appearance*** in mirror-display device **140**, which may operate in the ***mirror mode*** of operation. Then, when user **111** desires to view a ***previous appearance, e.g., for comparison***, controller **121** may receive a user input via input device **124** requesting to view the first trial. At this point, as shown in FIG. 3C, controller **121** may change the operational mode of mirror-display device **140** to the ***display mode*** using signals **141**. Controller **121** may also control device **140** to display the first trial. ***Therefore, by switching between operating modes of mirror-display device 140, user 111 may compare the user-appearance of the second trial with the user-appearance of the first trial and/or any other user-appearances previously stored in storage device 123***.

481 Patent at 10:66-11:20.

26.


FIG.3A


FIG.3C

27. In fact, the specification consistently describes the inventive solution to the problem described in the specification as providing a "mirror mode" (a current mirror image of a user's appearance) and "display mode" (a saved image of the user's previous appearance) that enables appearance comparison, *See, e.g.,* 481 Patent at Abstract, 1:53-64, 2:36-46, 2:50-3:3, 3:30-51, 3:62-4:45, 5:47-57, 6:50-7:5, 11:21-12:9.

28. The claims recite the same inventive elements. For example, limitation (d) of Claim 1 of the 481 Patent recites "a controller to selectably switch the mode of operation of said station between said mirror mode and said display mode according to a user command, and to cause the mirror-display device to display said image when the station is in said display mode." *See also id.* at Claims 3, 9, 12, 16, 18; 883 Patent Claims 1, 2, 12.

29. In view of this disclosure, it is my opinion that one of ordinary skill in the art would regard the preamble's recitation of "appearance comparison" as an essential and necessary part of the claims. Put another way, a person of ordinary skill in the art would conclude that a system that satisfied other elements of the claims but did not provide for appearance comparison, such as one

8

that displayed successive mirrored images of different people, or that displayed a reflection of a garden and then a skyscraper, was outside the scope of the invention.

30.    As I understand them, the effect of Defendants' position that the preamble is not limiting, in combination with their proposed constructions of "mirror mode" and "display mode," would be to include such systems within the scope of the claims. For the reasons stated above, I disagree that a person of ordinary skill in the art would conclude that enabling appearance comparison is not a necessary part of the claims. As such, I disagree with Defendants' position, and it is my opinion that one of skill in the art would regard the preamble as a limitation.

### B.    Disputed Term: "mirror mode" (481 Patent, 883 Patent)

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| A mode to display the current appearance of a user as if reflected in a mirror. | A mode of operating as a mirror, where a "mirror" is a reflective surface. |

31.    I understand that, in connection with the term "mirror mode," Defendants propose that the claims should be limited to a physical mirror with a "reflective surface," in connection with both the term "mirror mode" and "mirror-display device." I disagree that a person of ordinary skill in the art would understand these terms, or any other in the 481 and 883 Patents, should be limited to a physical mirror with a reflective surface.

32.    One basis for my opinion is that the specification discloses numerous embodiments of a "mirror-display device" that would not be regarded by a person of ordinary skill in the art as a suitable reflective surface for a mirror display that permits appearance comparison. The specification discloses a display that can change its optical properties to function as a mirror, as well as an example of a mirror-display device using a display that has been intentionally provided with a highly reflective surface by the manufacturer, Royal Philips Electronics, in order to allow the display to function suitably as a mirror. 481 Patent at 4:59-5:9. These embodiments would

provide a reflective surface that a person of ordinary skill in the art would regard as suitable for use with the claimed inventions.

33. However, the specification then provides numerous examples of mirror-display devices with displays that would not be regarded by a person of ordinary skill in the art as a suitable reflective surface for a mirror display that permits appearance comparison.

> According to some demonstrative embodiments of the invention, mirror display device 140 may be implemented by a LCD HD ready mirror TV such as, for example, model No. 32PM8822/10 available from Royal Philips Electronics, e.g., as described at the Internet site <http://www.research.philips.com/newscenter/archive/2003/mirrortv.html>. Such a device may include, for example, a polymer-based organic light-emitting display (OLED). Mirror-display device 140 may include any other suitable device implementing any suitable display technology. For example, device 140 may include a nano-emissive display (NED); a plasma display panel (PDP); a cathode ray tube display (CRT); a Digital Light Processing (DLP) display; a surface conduction electron emitter display (SED); a Tablet screen; a flat-panel SED; an Organic electronic display; electronic paper; a 3-Dimensional display, e.g., a Hologram display; a thin film resistor (TFT) display; an optical TFT; a Dot Matrix LED screen; an LCD having CCD capabilities, e.g., such that mirror-display 140 may be capable of performing the functionality of imaging device 130; a paintable LCD; a surface-conduction electron-emitter (SED) display; a high definition television (HDTV) display; a rear projector display device, and the like.

481 Patent at 5:4-25; see also 841 Patent at 8:1-37.

Many of these examples, such as OLED, CRT, DLP, TFT, or HDTV displays, describe displays whose typical use would be as a computer monitor or television, and any reflectiveness they may have is entirely incidental to their function as a display, and would be regarded by an ordinarily skilled artisan as not suitable for use as a mirror for appearance comparison.

34. The specification also discloses that the "imaging device 130 may capture the appearance, and controller 121 may generate a mirror-image corresponding to the appearance captured by imaging device 130. For example, storage 123 may store instructions that when executed by controller may result in any suitable method or algorithm of rotating, reversing, and/or

mirroring the appearance captured by imaging device 130, thereby to generate image data representing rotated, reversed, and/or mirrored image of the image captured by device 130." 481 Patent at 8:8-8:20. While the specification goes on to state that in these embodiments, the claimed system "may control mirror-display device 140 to display, during the display mode of operation, the rotated, reversed, and/or mirrored image," a person of ordinary skill in the art would understand this to be a non-limiting example of how these techniques are to be used, and would understand they could be used to generate a mirror image of a current appearance ("mirror mode"), or a previous appearance ("display mode"). In other words, a person of skill in the art would understand that such techniques are equally applicable to the "mirror mode" of operation.

35.     As such, I disagree that one of ordinary skill in the art would conclude that the claims should be limited to devices with a reflective surface. Instead, it is my opinion that a person of ordinary skill in the art, reading the claims, specifications, and file histories of the Asserted Patents, would understand the term "mirror mode" recited in the claims of the 481 and 883 Patents to mean "a mode to display the current appearance of a user as if reflected in a mirror," as Plaintiffs propose.

      **C.**     **Disputed Terms: order of method steps and "the non-ordered steps" (109 Patent)**

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning as understood by a person of ordinary skill in the art. | Indefinite. |

36.     I understand that Plaintiffs have proposed the plain and ordinary meaning for the order of the method steps and the term "the non-ordered steps" in the 109 Patent, and Defendants argue the claim is indefinite because of this language. I have considered both proposals, and it is my opinion that a person of ordinary skill in the art, reading the claims, specification, and file history of the 109 Patent, would understand with reasonable certainty the order of method steps

prescribed in the claims, and the meaning of "the non-ordered steps." Specifically, they would understand that steps 1(b)-1(d), describing certain image manipulations, may be performed in any order, as long as they are performed after step 1(a) and before step 1(e), and understand that steps 1(g) and 1(h) may also be performed in any order. One of ordinary skill in the art would further understand that that "the non-ordered steps" recited in steps 1(f) and 1(h), which both describe steps "performed on a series of images," refers specifically to elements 1(b)-1(d), since those are the steps performed on one or more images.

37. Claim 1 of the 109 Patent describes the following method steps:

| 1 Pre | A method for operating a system having a monitor, a camera, and a processor, so as to display a mirror-mimicking image on the monitor, by performing non-ordered steps comprising: |
|---|---|
| 1a | obtaining a digital image from a camera; |
| 1b | flipping the image about a vertical axis so as to reverse right and left sides of the image; |
| 1c | applying a transformation mapping to the image to modify the image such that it appears to mimic a reflection of a mirror; |
| 1d | resizing the image to reduce variations caused by changes in object's distance to the camera; |
| 1e | displaying the image on the monitor after performing the flipping, transformation mapping, and resizing; |
| 1f | wherein the non-ordered steps are performed on a series of images of a live video feed from the camera; |
| 1g | determining distance to a user appearing in the live video feed; |
| 1h | and, varying rate at which the non-ordered steps are performed on the series of images according to the distance. |

38. A person of ordinary skill in the art would understand from the claims and specification that although the preamble states that the steps of Claim 1 are "non-ordered," some of the steps do recite an order of performance. A person of ordinary skill in the art would understand that step 1(a), "obtaining a digital image from a camera," must occur before any of the manipulations described in steps 1(b)-1(d) can occur. That is because the "flipping," "applying a transformation mapping," and "resizing" steps of 1(b)-1(d) are performed on "the image," which comes from performing step 1(a), "obtaining a digital image from a camera."

39. A person of ordinary skill in the art would also understand that the language of step 1(e), "displaying the image on the monitor after performing the flipping, transformation mapping, and resizing," requires that this step must be performed *after* the flipping, transformation, and resizing operations described in steps 1(b)-1(d).

40. In my opinion, however, a person of ordinary skill in the art would understand that although steps 1(a) and 1(e) have a set order, the flipping, transformation, and resizing steps 1(b)-1(d) can be performed in any order so long as it occurs after step 1(a) and before step 1(e). Therefore, a person of skill in the art would understand that the "non-ordered steps" described in the preamble include steps 1(b)-1(d). For example, the embodiments described in the specification always list the transformation steps without any required order, only requiring that the image transformation "includes at least" the transformation steps described in steps 1(b)-1(d). *See, e.g*, 109 Patent at 28:49-62, 28:62-29:4; 29:22-28.

41. A person of ordinary skill in the art would also further understand that steps 1(g) ("determining distance to a user appearing in the live video feed") and 1(h) ("varying rate at which the non-ordered steps are performed on the series of images according to the distance") are also nonordered steps. The plain language of the claims shows that element 1(g) is listed separately from the "loop" of operations described in steps 1(a)-1(e) that call for obtaining an image, manipulating the image, and then displaying the image. Supporting this conclusion is the fact that step 1(g) also does not rely on "the image" as explained in steps 1(a)-1(e). As such, a person of ordinary skill in the art would understand it may be performed in any order within the scope of the claim, *e.g.,* before, during, or after performance of the other limitations.

42. I have reviewed the 109 Patent's prosecution history and found that it supports my interpretation of elements 1(f)-1(h). Elements 1(f)-1(h) were originally filed as dependent claims

17 and 18, and originally filed Claim 1 ended at the displaying step of element 1(e). *See* D.I. 57, Ex. 5 at EYESMATCH 0000649, EYESMATCH 0000651-652 (2013-03-15 Application). The Examiner amended the claims by cancelling originally filed claims 17 and 18 and added those limitations to Claim 1. *See* D.I. 57, Ex. 5 at EYESMATCH 0001019-1020 (2014-12-05 Notice of Allowance and Fees Due). One of ordinary skill in the art would understand that elements 1(f)-1(h) were separate and independent steps from elements 1(a)-1(e).

43. Finally, a person of ordinary skill in the art would also understand that the references to "*the* non-ordered steps" in elements 1(f) ("wherein the non-ordered steps are performed on a series of images of a live video feed from the camera") and 1(h) ("varying rate at which the non-ordered steps are performed on the series of images according to the distance) refers to steps 1(b)-1(d). On their face, steps 1(f) and 1(h) refer to operations that are "***performed on*** a series of images." The flipping, transformation, and resizing steps 1(b)-1(d) are the steps of the claimed method that are performed on a series of images. As described in the specification, the flipping, transformation, and resizing steps 1(b)-1(d) are performed, in any order, on a series of images from a live video feed, and the rate at which these steps are performed varies according to the distance to the user. *See, e.g.*, 109 Patent at 27:41-28:4.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge based on the information available to me at this time, and that this declaration was executed on December 17, 2021, in Urbana, Illinois.

_____
Dr. David Forsyth